case today. Our first case today is 2015-3210 Scott v. MSPB. Mr. Dandar. Good morning. Good morning, your honors. My name is Ken Dandar from Tampa, Florida. I have the honor of representing Terry Lee Scott, a disabled army sergeant who left the service because of her disability, applied for the post office, and was awarded a position there after her doctor cleared her for the type of work she would experience in manual distribution known as O3O. She worked there for 18 years without any problem, a good employee, and then she had surgery in 2013 to her leg, came back to work with increasing her disability in her feet from 30% to 90%, and continued to work in O3O manual distribution until February of 2014 when they told her she was assigned to automation. And she said, how am I going to do automation? I'm disabled. I have permanent restrictions. I remember reading in the record that there was, I couldn't tell it was a reduction in force or something, but the position that she'd had I think no longer was available and she bid for another position. Is that correct? She never bid for any position. Well, tell me a little bit about how that happened. The way the briefs presented it in the opinion below was if she'd bid for a position, didn't get it, and then she was given light duty assignments. Well, they placed her on light duty without telling her. Well, I understand that, but I mean, what caused the circumstance of the change? They said there was a change in the contract between the union and the postal service. However... And what effect did that have on her position? It had no effect on her position because she remained in O3O. When she went to automation as she was ordered to do, the supervisor said, you can't work here because it's too strenuous. You would think automation would be easier. You go back to manual distribution where they send all the disabled employees to. And that was in the early February of 2014. And the light duty coordinator, which is critical in this case, said, you need to bring in another doctor's note about your restrictions. Now they already had in the file from 2006 permanent restrictions on standing and walking. They ignored that. And so she comes back with another doctor's order that continues her restrictions up until May. And then they said, we need a permanent restriction or non-permanent. She goes back to the doctor in July. Following up on, I think what Judge Clevenger was just asking you, on JA361, this is the letter that Ms. Scott received indicating that she had to re-bid because her current position was being reposted. Isn't that right? Yes. So I guess I thought I understood what Judge Clevenger was asking you was about this change. I mean, you're telling us about what was happening in the job she was in. But then according to this, that job sort of terminated and she had to re-bid and she wasn't selected for the new position. Is that correct? She wasn't. That's correct. However, the Postal Service writings, the letter, do not, I hate to use the word jive, they don't jive with the practice of the Postal Service in Tampa, Florida, because she was permitted to go back to 030 and stay in 030. And then when she received the permanent restrictions in July of 2014 and handed that to me. Was that, was she legally entitled to go back or was that a gift? It was an accommodation. A kindness accommodation by the agency. It was required to make. Right, because you can't bid on 030. That's for the disabled. So you can't bid on it. So they put her where they could only put her and that was in 030. She stayed in 030, 18 years. But she, no, not, so we're not talking about 18 years because it was in 2014 when this change occurred. Correct. So we can't look at what had happened the 16 years before that. We're only looking at what happened as of 2014 and going forward. Okay. So in 2014 going forward, she received this letter. She remained in 030 because automation could not use her. So no matter what the letter says, automation could not use her. There was no other place for her except 030. She complied with the next demand request, which was get us another doctor's notice. When you say she remained in 030, does that mean she continued to go to work in the manual place and perform services and be paid for it? Yes, and remained there until she was walked out. But she wasn't formally an employee in 030 at that point at all. Throughout that time, she may have been performing or on loan to 030 or doing job duties there, but she was formally employed by automation, correct? No. No, she wasn't. Well, then who was she employed by? She was employed at 030. But is there any paperwork that indicated that? Because I thought that paperwork indicated that she was in automation. Well, her assigned bid was automation. Right. So there was this informal arrangement for her to be in 030. I never heard them testify that way, but they said that was the only place that she could work was in 030. So if the bid was automation and they knew she couldn't, and they all stipulated the hearing, that she could not do the job in automation. So that was not a meaningful choice under Bean. And that's why they kept her in 030. Then in August, after they received the walking, based on her surgery and her increased disability, they keep her in 030. Until August, they have a meeting with her, and they take her chair away, which was given to her from the 06 doctor's note. Now her disability is worse, and they take the chair away in 030. It's wrong for them to have taken the chair away. It just seems, quite frankly, somewhat inhuman to do. But at the same time, part of the reason behind that is they realized she was being provided with accommodations that she had not applied for and therefore hadn't been justified. And what you can imagine, as I can as an employer, if you make exceptions for one person, they haven't applied for, through the application process, the accommodations that they need. Well, suddenly everybody else now wants a chair, and everybody else wants light duty, and everybody else wants a change. So there's a process in place that if you follow that process, you can then be awarded that. And that allows the employer to be insulated from all the claims of disparate treatment by other employees who could say, well, she's got a chair. She didn't apply for disability. Why can't I have a chair? Do you understand the problem? I do. Which is why the system is set up that requires her to put forth an application, which she kept refusing to do, which is why we're here. No, the agency, I'm sorry to correct you, I'm sorry. The agency, Ms. Piorno, who's in charge of light duty, she just told her to get a doctor's note, and then when she saw permanent restrictions, she took it upon herself, as they do, without an application from the employee, to apply for reasonable accommodations with DRAC, and she testified under oath that that's exactly what she did on behalf of the employee, Terry Scott. What she testified to was that she testified that that's what she thought Ms. Scott was requesting when she turned in the doctor's note. She misunderstood. She thought, by virtue of the doctor's note coming in, that she understood that Ms. Scott was asking for accommodations. The only way to get accommodations is to apply for them. And she thought, well, why else is she providing a doctor's note? But, Your Honor, she had reasonable accommodations since she first started in 1996. They were improper. They weren't properly awarded to her through the process, which is quite well established within the government for providing accommodations. They were provided by human supervisors that made decisions that, quite frankly, they didn't have the right to do, and yet they gave them to her, which is why I'm saying it's a very human thing to do, right? I mean, I'd want to do it too for my employees, but within the rubric of a large organization like the government, they have very established processes that must be undertaken. Why wouldn't your client just file the paperwork? I don't understand. She was repeatedly asked, just file the paperwork for light duty, and she just kept refusing. Okay, that's different now. That's different than reasonable accommodations. She was never asked to file paperwork for light duty until the October of 2014, when she was you can't order someone to apply for light duty, and number two, they all testified, all the agency higher-ups testified that light duty is not for someone like her with permanent restrictions. Only DRAC, reasonable accommodations, is, and Peorno says, I gave that to DRAC. I thought I did, and that's all she had to do. When it came to reasonable accommodations, no one testified that she had to apply for reasonable accommodations. Peorno said, I did it for her. That's the way we do things in Tampa, and so my client relied upon that. When she did it, she did everything she was told to do. In July 2014, she gives her the note, reasonable, you know, permanent restrictions again, and Peorno said, I'll take care of it. Well, something happened because the DRAC person, Hill Commons, never got it, but more importantly, they should never have walked her out and taken her ID badge away that she could never get back in. She was forced out. Can you explain why, when her supervisor gave her the choice of applying for light duty and she refused, you had said just a minute ago that light duty is not something you apply for. What did you mean by that? You can apply for light duty. However, light duty is voluntary, and when she's a 10-point veteran preference. What do you mean by, what does it mean to say it's voluntary? The collective bargaining agreement, Article 13 states it's voluntary. What does that mean in the real world? That means if you don't want to apply for light duty and do the jobs and suffer physically, you don't have to apply for light duty. They ordered her to apply for light duty contrary to the collective bargaining agreement, which says it's voluntary, and they all testified, all the higher-ups, it's not for someone with a meaningful choice under being. She was not given a meaningful choice. Walk me through, if you will. Let's put ourselves in the shoes of the government. The government is saying your client, instead of staying home, should have, at work, asked for light duty. That's what the government's saying, right? That's what they're saying. So walk me through what would have happened if your client had not stayed home, but had been in the workplace and walked in and said, I want to do what the government wants. I want to apply for light duty. What would have happened? She loses her 40 hours a week employment. They just give her light duty. Wait, wait, wait. Why does all that? She gets light duty. They could afford her, accord her light duty. Yes, they could have. And that would have given her a place to work, and she would have been paid for her work. And they would have said, we don't have any light duty assignments for today. Stay home. And then she's down to less than 40 hours. She would have had continuing employment and light duty status, whatever that entails, as opposed to full-time work, which I think the record shows she wasn't able to do anyhow. I mean, she didn't have a job because of this restructuring that I first asked the questions about. She was sort of in no man's land, right? Well, I disagree because she had a job. She had a night shift that nobody wants to work. And it was interfering with their diabetes, but she kept at it anyway because she was a loyal employee. And they kept assigning, they kept putting her in O3R. What I'm trying to get at by the last question I asked is what would happen if she had come to work and said, I want to apply for light duty. And you just said to me, I believe that she could have been accorded light duty. Would have given her not the job she wanted, but it would have given her a position. But according to the supervisors, Ms. Piorno in particular, she was not a candidate for light duty because of this letter of July 2014 saying again, permanent restrictions. Worse than the letter from 2006. If she had come back into the government and applied for light duty and they'd said, well, you don't qualify for light termination. Well, if you don't qualify for it, but Piorno said you don't qualify for light duty because it's permanent. It's very, very permanent and very restrictive. Where in the record is that? You're saying Ms. Piorno said that, but where in the record is that? In the record, it's in her testimony cited again in our reply brief that light duty is not for light duty. Let's see. I'm sorry. I don't have that. It's Piorno's testimony. The post office admits in their brief that the testimony of their supervisors are contradictory. First they say she's not a candidate for light duty and it's at 618 to 619 of the appendix. Light duty is not for one having permanent restrictions. Who says that? Your client? No, Piorno, the light duty coordinator. The reason why she took this letter of July 2014 and said that she then handed it or sent it over to Drack for reasonable accommodations. Drack says they never got that letter, the doctor's note. And what's interesting is they walk her out on October 18th of 2014 and she is not permitted to return in the 14 day period goes by. And after that 14 day period, she's supposed to be given, oh my, I'm in my red zone. I'm sorry. Okay, we'll restore some of your rebuttal time. Let's hear from opposing counsel, Mr. Singley. May it please the court. Ms. Scott, in order to establish jurisdiction at the MSPB, needed to establish two elements. She needed to establish that she was not given a choice in the matter of not showing up to work and that the agency did something wrong. She didn't establish either of those elements at the board and therefore the board correctly determined that it didn't have jurisdiction. To clarify some of the factual assertions that have just been made, no, Ms. Piorno did not ever indicate that Ms. Scott could not have requested light duty. Um, she merely pointed out. What about the provision you just, your adversary just cited? I'm sorry, are you talking about the testimony of Ms. Piorno? Right. So, uh, what Ms. Piorno indicated was that, uh, she actually could have requested light duty. She could have requested light duty multiple times, but that the, the system that the agency has in place for a permanent accommodation, um, is this reasonable accommodation process, which is a separate process from, uh, how they go about doing light duty. Light duty. Is that through DRAC? Correct, Your Honor. Okay. So it's just a different organization. Light duty temporary goes to one group of people. Permanent light duty goes to the DRAC committee. Correct, Your Honor. In fact, uh, light duty is, is really just Ms. Piorno and then the union representative. So, um, Ms. Piorno was the one that was working with Ms. Scott directly. Ms. Piorno is the, or she, Ms. Piorno is the light duty coordinator. Yes. And then who else? There's someone else that, uh, or Mr. Andriotis, that's the... Mr. Andriotis was her, uh, supervisor on October 17th and 18th. So we heard a couple of things from your opposing counsel. One was, um, that once Ms. Scott submitted the second doctor's letter in July of 2014, that made it very clear that Ms. Scott was looking for some kind of permanent arrangement. And so by the time of either apply for light duty or go home, um, it would seem like the letter of July 2014 from the doctor, uh, had already made it clear that applying for light duty would not make any sense. So what is your response to that? A couple of responses, Your Honor. First of all, the letter from July doesn't provide very much information at all. It's basically just the same clause that says this condition is permanent, uh, for either light duty or permanent reasonable accommodations. Um, the agency has a responsibility for the employee safety to seek more information. And that's what the light duty request would have provided is more information. What exactly are your limitations? What can you do? Uh, how long can you do it? There's a whole, uh, list of information that she's supposed to provide in that light duty request. And then it's much more detailed for the reasonable accommodation. Um, and the reasonable accommodation first, she fills out paperwork that provides all of her limitations, what she can do for how long. And then that documentation gets sent to her treating physician and a treating physician has to go through and provide specifics about the diagnosis. And just curious, why is it that the options that she was given in October of 2014 didn't include the option of filing for a reasonable accommodation through your honor? I, my understanding was that she was, uh, she was told she needed to request light duty and that, uh, that it was also communicated to her that she could also request a reasonable accommodation. Um, but I don't see the same as I go when you apply for light duty, the person that's assessing your application looks to see what your circumstances are, looks at what the doctors say. And then if that person concludes that you have a permanent problem, they say, well, light duty is not for you, go over to DRAC and apply over there. Isn't that what you told us a minute ago? Yes, your honor. But, uh, so, so they did. Let me just run that through the, through the projector and put it on the screen for purposes of what she was being told in October 14. They said your retirement was voluntary because it wasn't involuntary because you could have come back and applied for light duty. And what would have happened was you would have gone to light duty and they would have said, well, give me some more doctor's reports. Let me assess this. And they assess all that and say, Hey, you're in the wrong pigeonhole. You don't belong in light duty. You belong in the other place. Is that the way it would have played out? Is that what you're telling us? Uh, your honor, she could have been put on light duty while they were assessing the, uh, reasonable accommodation. Um, and so I'm just trying to square up the reality of her condition, which seems to be that she couldn't possibly have held a light duty position properly in the agency over a long period of time, because that's not what light duty is for. But the, so when, when this is what Judge Chen said, why weren't they clear in saying, well, your option also was to apply for a DRAC or whatever it is? Uh, your honor, I don't, I don't know. Um, I don't have the exact language that communicated to her with respect to DRAC. Um, but Ms. Pirani told me a minute ago that there was some language to that effect. How can you say that unless it's in the record? Well, okay. The, the record evidence shows that she did, she was familiar with the DRAC process because she had sought reasonable accommodations in 2013. She was familiar with it, but was that an option that the agency was saying you should, it's available to you? Uh, your honor, I don't, I don't, I don't think that there's specific language in the record from October saying that reasonable accommodate, that she also needed to request reasonable accommodation. So I think that's the problem that Judge Clevenger is getting at. In fact, the board opinion makes fact findings on this, don't they? Doesn't the board opinion make the following fact findings? She had three choices, I'm reading from page three of the board's opinion, work in her assigned position, submit a light duty request, or go home. So I, I, I don't think there's any confusion. I don't see anywhere in the board's opinion where she was informed that rather than go home, she could also file for reasonable accommodations, which would be a totally different thing than the light duty request. I think in that moment, your honor, she, she still needed to request light duty because, I mean, reasonable accommodation takes time. She has to file that paperwork and the agency has to consider it. And they had the option to deny the reasonable accommodation as they did in 2013. So at that time, the agency was saying you can't come into manual distribution and sit in a chair unless you have light duty. You have to request light duty. If that's what you want, and that's what she was indicating that she wanted to do, was sit in a chair in manual distribution, they were saying you have to be on light duty list, and that was correct. And, and Ms. Pirino did testify that while it's not ideal to permanently assign somebody to light duty, in fact, I'm sure that at a certain point they would have gone through the DRAC process and assessed the permanent situation, but she could have continued to request light duty in sequence. And she was given light duty in April, I'm sorry, in May for a period of two weeks. That was their response to the original doctor's note. And she wasn't actually made aware of until after the two-week period expired. Correct, your honor, but that was a miscommunication because Ms. Pirino... She was put on light duty except she didn't know she was actually put on light duty. Right, I think Ms. Pirino was trying to be, trying to read her, she basically just walked in and handed the doctor's note to her supervisors, and they didn't know what to do with that. They did assign her light duty, and then she came back with another doctor's note. And in the meantime, I think the record shows there was a, I apologize I don't have the exact site, but there was a letter from one of the senior managers that was noticing some sort of an issue, and they said, look, if you're going to be in a chair in manual distribution, you have to be on the light duty list. Or have reasonable accommodations through DRAC. Correct, your honor, and again, reasonable accommodations is not necessarily going to put her in that chair in manual distribution. It could be some kind of a reasonable accommodation that's not on even on site, and that was part of the issue with the 2013 request for reasonable accommodation, because she very narrowly sought to stay in her position in manual distribution, and they told her we don't have anything for you there, so your request is denied. And so just so I understand, so when a person requests a reasonable accommodation, it may be that they can't stay in job, and that they may have to move to a totally different job, which would allow for their limitations, or it could be the case that there is no job within the organization that could work out for them given their limitations. Is that right? That is correct, your honor. That is correct. So the reason why we're having this discussion, I believe, is because Ms. Scott believes that when she was told she had the option of submitting a light duty request, that was illusory. That it was, you know, there was no, that was false hope, right? That bottom line, that's her point, is that that wasn't illusory. That was a fake option. That's what she's saying, and what you're trying, I think, to explain to us is that it was a realistic option that could lead in any number of directions. It was a realistic option. It was the first step that puts her, asked for a light duty. If the light from which she can either try to continue light duty, or if the decision is made that light duty is wrong, she can then apply for a reasonable accommodation. That's correct, your honor, and again, isn't your argument basically that the option was not illusory because there was light at the end of the tunnel, possibly? That's correct, your honor. I mean, she, the situation in that moment at that day was that if she wanted to sit in a chair in manual distribution, she needed to request light duty, and she could have. Now she's arguing that that was illusory. At the time, she simply said, I don't have to do that. I'm a 10-point veteran. She was very concerned about her disability status as a 10-point veteran. Could you, I'll have to ask your opposing counsel on reply, but that was what I was trying to decipher, what the argument was below in front of the board, as well as the Veterans Court. There was some relationship with her status as a 10-point veteran, and maybe a disabled veteran, and she expressed some kind of concern that applying for light duty would either jeopardize her status as a 10-point veteran, or alternatively, she was already entitled to light duty as a basis. My understanding is that none of that is true. There's no basis for those claims. That's a different question. The other question is, what is the actual argument that the board and Veterans Court had to resolve? So, I looked at the testimony. The testimony she indicates, she says, they've always known about my feet. They've known about my feet since I was hired. So, one place to start is by looking at the 1996 doctor's note, which was provided that explained that she did have these issues with her feet, but also explains, and that's at appendix 119, that she was cleared to work. She was cleared to do everything that they had for her to do, including lifting 70 pounds, standing for 12 hours, etc. The administrative judge, well, in her testimony during the jurisdictional hearing, it was repeatedly asked, did you ever formally request an accommodation for your feet? Have you ever sought any kind of formal accommodation for this issue? And she admitted that she had not. And so, I don't know what the reasoning is for her claim that she thought that her 10-point veteran preference was at stake. That's just not factually correct. A 10-point preference is something you get when you're applying for the job. It gives you a preference over other people applying for the same job. Can you remind me where in the record she indicated that she had never made a reasonable accommodation request or a light duty request with respect to her foot condition? Because I seem to recall that, too. But the submission of the doctor's letters obviously represents something. I'm sorry, Your Honor, the doctor's note? Right. Well, so again, the doctor's note, as far as what the agency has to offer her, is not sufficient for her to just go and choose for herself to go sit in manual distribution and put herself on light duty. Well, but if you look at, let's look at footnote three of the board's opinion, which touches on these questions that you're discussing with Judge Chen. I'd like to follow up on his question. Do you have footnote three of the board's opinion here? Oh, I'm sorry, Your Honor. It's on appendix page six. Yes. I know what you're talking about here. I'll wait until you find it. Correct. Sorry, I got you. So it says, the appellant appears to believe that as a preference eligible veteran, she is guaranteed a 40-hour work week as long as she does not request light duty, even if she cannot perform the full duties of her position. And then it says, however, the appellant has cited no statutory or regulatory authority and we have found none, which supports her claim that she will forfeit her 10-point preference if she requests light duty. So what that addresses is her argument vis-a-vis light duty, but what it doesn't address is the argument in the same sentence about the fact that she holds the belief that she's, because she is a 10-point preference eligible veteran, she's guaranteed a 40-hour work week, even if she can't perform the full duties. So I guess my question to you is, is that true if you're a 10-point preference eligible veteran? And if you need reasonable accommodations because of an injury, are you guaranteed a 40-hour work week? Is the government prohibited from moving you out of that position? No, Your Honor, I don't believe so. I don't have, there is no support for that claim. And based on the original letter in 1996, when she applied for the job, she was originally able to do the 40-hour work week and do all of the manual labor they were asking her to do. So it seems that her claim that this status, this 10-point status, really had nothing to do with whether or not she was able to do the work they were asking her to do. My understanding is the agency is not, I mean, in 2013, the agency denied her request for reasonable accommodation. At that point, she had the opportunity, I mean, she quit, she could have quit working at that point. But no, the agency is not obligated to keep somebody in working status when they're not able to do what the agency needs them to do. And Mr. Andrew Otis testified that there was work that needed to be done in automation that wasn't being done because she wasn't in there. So she's essentially taking somebody else's job. And being a 10-point veteran does not justify her doing that. Okay, thank you very much. Let's restore two minutes of rebuttal time, please. The 10-point veteran status has only one thing. It requires a 30-day notice under the collective bargaining agreement before you force a veteran out. They have to be given 30 days notice, and she was never given any notice whatsoever. But that assumes the conclusion that she was a meaningful choice in October 2014 of an option of applying for light duty so that she can maybe get the chair back and continue to work in 030, or refuse to apply for light duty and then therefore go home. When they took her chair away, it was okay because she would lean up against the rest bar when she needed to. She didn't make a big deal about that, and she had a meeting in February, and they put her on light duty. Her biggest thing was, I never requested it. Fine. But as February 2014, she's on light duty, and her status never changed. So when Peorino hands this letter of July 2014 with more restrictions that are now classified again as permanent, they don't come back to my client and say, oh, by the way, now you've got to fill out an application. They don't do anything. They leave her where she is in 030 on light duty because they put her there. So why ask her in October, oh, now you have to apply for light duty all of a sudden? Why? There's no reason to. Peorino already had her on light duty. Nothing's changed. But all of that was, at that point, informal. And so now they wanted to get things regulated on the books and have paperwork to justify the light duty. It's not informal because they had a meeting in February 2014. They determined she's on light duty then, and they gave her that letter that you're on light duty, and go get this doctor's note. But it was temporary, and it expired. And they said, get another doctor's note. And so she did, and she handed it to them, and they gave her no more instructions. So they forced her out on October 18th without any written instructions, without a 30-day notice. Well, again, this all back to the option that they gave her, which was, please apply for light duty. And for whatever reason, she elected not to apply for light duty. And the collective bargaining agreement says... If you're forced out, but we're back to square one. She's not forcing out if they give her an option. Right. But all the testimony is, light duty is not available for someone like her with permanent restrictions. Okay, Mr. Dander, we have your argument. We're well over time. Thank you. We need to move on to the next case. I thank both counsel. The case is submitted. Our next case is 2016-1485.